

**EXHIBIT**

tabbies®

**B**

Professional Distinction

Personal Dignity

Patient Advocacy

**May 15, 2020**

Mr. James McGlade
Vice President, Human Resources
United Hospital
333 North Smith Avenue
Saint Paul, MN 55102

Via Email only: jim.mcglade@allina.com

Re. MNA Grievance Number: **2020-437**

Dear Jim,

On May 8, 2020, Cliff Willmeng, RN in the Emergency Department at United Hospital was terminated without just cause.

MNA is advancing the termination of Mr. Willmeng to a 2nd step grievance.   We are requesting that the termination be reversed, that the discipline be removed from his file, and that he be made whole for all losses.

Please provide the following information no later than the close of business on May 19,2020:

1) Mr. Willmeng's personnel file.
2) Any witness statements, notes of witness interviews, and other investigatory notes considered in issuing the discipline, particularly but not limited to the events of April 24, 2020.
3) Copies of any and all emails in which there was discussion regarding the pause or resumption of approaching RNs to discuss the wearing of hospital-provided scrubs.
4) All communication between the ED management team and the house supervisor on or around April 24, 2020, in relation to the interactions with the grievant.
5) A copy of the "Respectful Workplace Policy".
6) A copy of the "Code of Conduct"
7) Complete detailed evidence of the employer's claim that Allina provides "a full continuum of safety measures" a listing of all steps taken to design the facility to assure employee safety.
8) A copy of the "PPE champions" program the employer claims exists.

345 Randolph Avenue
Suite 200
St. Paul, MN 55102
Tel:   651.414.2800
         800.536.4662
Fax:   651.695.7000
Email: mnnurses@mnnurses.org
Web:   www.mnnurses.org



AFL-CIO

CASE 0:21-cv-01364-MJD-KMM Doc. 2 Filed 06/09/21 Page 2 of 35

9) A complete documentary history of the communications between United Hospital management, infection prevention personnel, Allina leadership, and any state or federal agencies that the employer relied upon to determine that United would not offer hospital issued scrubs RNs in the Emergency Department and other COVID units.

10) A copy of the agreement with the coop indicating the availability of laundered scrubs, the inventory of scrubs provided by the coop, and any communication regarding the ability or inability of the employer to attain sufficient scrubs to provide them to nurses.

11) Inventory of PPE that would sufficiently cover all of the employee-provided scrubs in order to prevent the employee scrubs from becoming infected, from head to toe, including sizes of the items.

We are proposing that this issue be discussed at the grievance meeting scheduled on May 20.

Thank you,

Ron Neimark

EXHIBIT

tabbies'

C

## IN THE MATTER OF ARBITRATION BETWEEN

|  |  |  |
|---|---|---|
| **MINNESOTA NURSES ASSOCIATION,** | ) | |
| | ) | |
| Union, | ) | |
| | ) | |
| **and** | ) | **WILLMENG DISCHARGE** |
| | ) | **GRIEVANCE** |
| | ) | |
| **ALLINA HEALTH** | ) | |
| **(UNITED HOSPITAL),** | ) | |
| | ) | |
| Employer. | ) | |
| | ) | **FMCS CASE NO: 200821-09339** |
| | ) | |

| | |
|---|---|
| Arbitrator: | Stephen F. Befort |
| Hearing DateS: | January 28, 29, and February 1, 2021 |
| Post-hearing briefs received: | March 19, 2021 |
| Date of Decision: | April 20, 2021 |
| | APPEARANCES |
| For the Union: | Christopher K. Wachtler |
| For the Employer: | Dominic J. Cecere |

## INTRODUCTION

Minnesota Nurses Association (Union), as exclusive representative, brings this grievance claiming that Allina Health (Employer) violated the parties' collective bargaining agreement by discharging Cliff Willmeng without just cause. The Employer maintains that it was justified in terminating the grievant for his failure to adhere to United Hospital's Dress Code and Scrub Clothes policies, violating United's Use of Personal Electric Equipment policy, and violating United's policies on workplace conduct. The grievance proceeded to an arbitration hearing at

1

which the parties were afforded the opportunity to present evidence through the testimony of

witnesses and the introduction of exhibits.

## ISSUES

1.  Did the Employer have just cause to discharge the grievant?  If not, what is the appropriate remedy?

2.  Whether the Employer's actions relating to grievant violated Articles 17, 20, or 22 of the CBA?

3.  Whether Kelly Johnson informing grievant on March 25, 2020, that he was not allowed to conduct Union business in a patient care area violated the NLRA?

## RELEVANT AGREEMENT PROVISIONS AND WORK RULES

## COLLECTIVE BARGAINING AGREEMENT

### Article 17

DISCIPLINE AND TERMINATION OF EMPLOYMENT

No nurse shall be disciplined except for just cause.  The parties agree that the principles of just cause will be applied where there is a need to take disciplinary action.  Except in cases where immediate termination is appropriate, the Hospital will utilize a system of progressive discipline. The seven tests of just cause will be applied as follows.

Just cause is defined by the following test:

*   Was the rule or order reasonably related to the Employer's business interests and performance expected of the employee?
*   Did the Employer give the employee notice of the rule and the consequences of their failure to obey the rule?
*   Did the Employer investigate the matter before administering discipline?
*   Was the investigation fair and objective?
*   Did the Employer obtain substantial evidence of guilt in the investigation?
*   Has the Employer applied the rules and discipline even handedly and without discrimination?
*   Was the degree of discipline imposed reasonably related to the seriousness of the offense?

### Article 20

Subsection (a) Practice Philosophy:

. . .

2

There is no substitute for professional judgment. All decisions to delegate nursing care must be based on the safety and welfare of the client.
. . .

Subsection (d) <u>Reporting of Errors</u>: It is Allina's intent to develop a system of blameless reporting of errors that recognized the complexity of our systems. It is our goal to create a just culture recognizing individual and organizational accountability that includes:
(1) Identifying errors
(2) Focusing on understanding what caused the error
(3) Implementing changes to prevent recurrences
(4) Limiting discipline only misconduct or impairment

<u>Article 22</u>

(a) <u>Safety Policy</u>: Is shall be the policy of the Hospital that the safety of the nurses, the protection of work areas, the adequate education, and necessary safety practices, and the prevention of accidents are a continuing and integral part of its everyday responsibility. Further, the Hospital is committed to providing employees a work environment that is free from hostile, abusive, and disrespectful behavior. It shall also be the responsibility of all nurses to cooperate in programs to promote safety to themselves and to the public, including participation on committees, and to comply with rules promulgated to ensure safety and a violence free workplace. This nurse responsibility shall include the proper use of all safety devices in accordance with recognized safety procedures.

(b) <u>Equipment and Facilities</u>: The Hospital will make reasonable effort to provide nurses with safe and adequate equipment, working environment and facilities.
. . .

(g) <u>Biological Hazards/Agents</u>: The Hospital will make available information and educational material regarding any known hazards/agents.
. . .

(n) <u>The hospital will develop a plan</u> and guidelines to reduce the risk of exposure and manage the post-exposure treatment for infectious disease. The hospital and MNA will meet to review the plan and guidelines, and to discuss and identify concerns with plan content for consideration to be included in the plan and guidelines.

**WORK RULES**

<u>Dress Code Policy</u>

The purpose of this policy is to provide Allina Health staff member's guidance for appropriate appearance to maintain the exceptional quality and service associated

3

with the Allina Health brand. The staff member's appearance greatly impacts patients, visitors and the communities we serve.

. . .

<u>Uniform Guidelines</u>

You must wear the approved uniform attire based on your department requirements.
. . .

Repeated noncompliance may result in corrective action up to and including termination.
. . .

<u>Roles Affected</u>
. . .

RNs with direct patient contact [must wear] Navy Blue [scrubs]

. . .

<u>Laundering</u>

**Blood or Body Fluid (BBF) Exposure:** Hospital employees who have personal scrubs and uniforms that become visibly contaminated with blood or body fluids should change them as soon as possible and will be authorized to change into hospital-owned ceil blue scrub apparel. These loaned scrubs need to be returned on the employee's next working shift. The contaminated scrub and uniform will be laundered by the hospital following site-specific BBF Exposure Control Plan procedures.

<u>Scrub Clothes Policy</u>

Scrub clothes that are hospital owned and maintained are ciel blue in color and are to be worn only as outlined in this policy. Scrub clothes are not personal protective equipment. Appropriate barriers, i.e., gowns, must be worn in addition to scrub clothes to protect skin and uniforms/scrub clothes from blood/body fluid exposure.

<u>Procedures:</u>

Staff assigned to the following areas are allowed to wear hospital- provided scrub clothes as outlined in the system-wide policy Attire for Semi-Restricted and Restricted Invasive Procedure Areas (SYS-IC-AIPCC-007):

- 2300 (during births)
- Anesthesia

4

- Central Sterile Processing
- Day Surgery Center
- Endoscopy / special procedures
- Interventional Radiology
- Labor and Delivery
- Nasseff Heart Hospital (OR and CV/EP Lab)
- Operating Room
- Pathology (during autopsy)
- Post Anesthesia Care
- Pre-Operative Care
- . . .

**Uniforms Soiled with Blood or Other Potentially Infectious Materials**
If employee-owned uniform becomes contaminated with blood or body fluids,
follow procedure outlined in OSHA Bloodborne Pathogen Exposure Control Plan
(UTD-PC-IC-011).

<u>Use of Personal Electronic Equipment Policy</u>

<u>Purpose:</u>

Patient care areas are intended to focus on patient care, be calming and put patients
and their families at ease, in order to bring a sense of tranquility to the healing
process. Using personal electronics in patient care areas can be perceived as
distracting from the focus on patient care. In addition, this policy is intended to . . .
protect patient privacy.
. . .

[E]mployees may not use their personal electronic equipment (such as, but not
limited to, cell phones, iPods, iPads, radios, PDAs, Blackberries, game boys, etc.)
during work time unless:
. . .

[S]uch use is for a business purposes (other than for diagnostic, treatment or
identification purposes) and is approved by the employee's manager;
. . .

Patient Care Areas – No personal use is allowed.
. . .

Patient Care Areas include:

- patient rooms
  . . .

5

Allina Health reserves the right to determine, in its sole discretion, whether an employee's use of personal electronic equipment is inappropriate. Improper use of personal electronic equipment will result in corrective action.

## Respectful Workplace Policy

. . .

A respectful workplace is free of unacceptable behavior, which includes but is not limited to:

• Raising your voice

. . .

• Engaging in hostile or intimidating interactions

. . .

If you violate this policy, you may be subject to corrective action.

## Code of Conduct

Allina Health is committed to creating a working environment in which every employee lives Allina Health values in everyday decisions and actions. The Allina Health code of conduct contains a series of commitments that reflect how you demonstrate these values in your relationships with patients; co-workers; the organization; the government; and business partners, vendors, competitors, and the community.

. . .

RESPECT We treat everyone with honor, dignity and courtesy. We respect the values, cultures, beliefs and traditions of others. We value the skills, talents and dedication of everyone with whom we work. We are committed to working collaboratively with one another and to providing consistent, coordinated care. We demonstrate cooperation and teamwork in all our actions.

. . .

As an employee, you are expected to carry out the Allina Health values of integrity, respect, trust, compassion and stewardship in all of your actions.

. . .

You have a responsibility to read the Code of Conduct and commit to living the values. In addition, you are responsible for:
• upholding the values in your everyday work

. . .

As an Allina Health employee, you must abide by the values and commitments. Failure to do so may result in Corrective Action.

6

## FACTUAL BACKGROUND

Allina Health is a not-for-profit health care system that operates many hospitals and clinics throughout Minnesota and Wisconsin. Among other facilities, Allina Health operates United Hospital in St. Paul, Minnesota, which is the largest hospital in the Twin Cities east metro area, and Abbott Northwestern Hospital in Minneapolis, which is the largest private hospital in the Twin Cities.

The Employer hired Cliff Willmeng in October 2019 to work as a registered nurse in United's Emergency Department. The Employer terminated Mr. Willmeng's employment on May 8, 2020 primarily for repeatedly violating United's Dress Code policy by wearing hospital-issued scrubs rather than required personal scrubs.

United Hospital adopted its current Dress Code policy in 2012. That policy provides for a color-coded system by which employees are required to wear the color designated for their respective department. Registered nurses with direct patient care responsibilities, such as Willmeng, wear their own personal navy blue-colored scrubs. Pursuant to a related Scrub Clothes policy, United employees may substitute hospital-provided and laundered ceil blue scrubs for personal scrubs in two instances: 1) if the employee works in a semi-restricted or restricted invasive care procedure area; or 2) if any employee's uniform is contaminated with blood or body fluids. The Emergency Department is not considered to be a restricted or semi-restricted invasive care procedure area.

The COVID-19 pandemic reached Minnesota in March 2020. By the end of that month, Minnesota was in lockdown mode with many businesses and schools closed. Hospitals, however, were considered essential, and the emergency room at United Hospital continued to provide in-person care to patients. Both United management and staff employees were naturally

7

concerned with how to limit the spread of the virus while continuing to provide in-person services.

United Hospital's response to the pandemic was led by its Infection Prevention and Control Committee. This committee reviewed the scientific research and recommendations with respect to COVID-19 and developed a system-wide COVID-19 Infection Prevention and Control Response Plan. This plan was continuously monitored and updated. The policy was made available to employees on a dedicated internet site (the AKN), and United's Incident Command Center frequently sent out e-mail communications highlighting key developments and recommendations.

While management witnesses touted these communication efforts, many employee witnesses did not share this view. Brittany Livaccari, who served as MNA Co-Chair at United, testified that she found the volume of COVID-related communications to be overwhelming and that many nurses were confused and fearful for safety. A key concern was focused on the issue of uniform scrubs. Several employees were concerned that their personal scrubs could become contaminated while at work and then pose a risk of infection to family members when the scrubs were brought home for washing. The Union brought these concerns to the Employer's attention by letter in late March and then filed a grievance related to health and safety concerns on April 9, 2020.

Nurse Willmeng was among those employees who believed that the Employer was not doing enough to maintain a safe working environment. As a Union steward, he reviewed numerous scientific articles to enhance his ability to advocate for appropriate safeguards. Willmeng testified that his research led him to believe that the virus could remain infectious on clothing for a lengthy period of time. He believed that United's scrubs policy potentially

8

exposed his family to the virus, and he sought to take every possible precaution to mitigate this danger.

Beginning on March 24, 2020, Willmeng donned hospital-provided scrubs available in the men's locker room for his work shifts rather than wear his regulation navy blue personal scrubs. When this practice continued for the next two weeks, the Employer held two educational meetings and one counseling session with Willmeng. During these meetings, supervisors reviewed United's Dress Code policy and explained that the hospital's policy was consistent with the recommendations of leading health agencies such as the Center for Disease Control (CDC) and the World Health Organization (WHO). These sessions did not result in the issuance of any discipline.

On April 15, 2020, the Employer issued Willmeng a verbal warning for that day's violation of the Dress Code policy as well as for violating United's Use of Personal Electronic Equipment (UPEE) policy. The Employer alleges that Wilmeng violated the UPEE policy by taking "selfie" pictures in patient care rooms and posting them to various social media sites. On the following day, the Employer issued Willmeng a written warning when he again presented in hospital-provided scrubs for his work shift.

Around this time, at least five other RNs who worked in the Emergency Department also wore the non-regulation hospital-issued scrubs and were subject to non-disciplinary counseling. Some of these employees joined Willmeng in expressing their displeasure with the hospital's Dress Code policy.

In response to these concerns, United decided to "pause" its enforcement of the Dress Code policy and to take another look into these concerns. United's Infection Prevention and Control Committee reviewed the scientific literature as well as the recommendations of the

9

leading health agencies to determine whether a change in policy was indicated. The Committee eventually concluded that the scientific evidence did not support a change in policy. United also used the pause to assign Vice President of Operations Jill Ostrem to determine whether the hospital-wide provision of hospital laundered scrubs was feasible as a matter of logistics. Ostrem testified that she ascertained the existence of supply-chain shortage of the ceil blue scrubs and that she believed that United would run the risk of running out of hospital-provided scrubs for employees working in restricted invasive procedure areas if it attempted to expand the provision of these scrubs to staff working outside of these areas. United, accordingly, ended its "pause" with a communication informing employees that it would resume enforcement of the existing Dress Code and Scrubs Clothes policies.

On April 24, 2020, Willmeng was wearing hospital ceil blue scrubs when he was approached by Nursing Supervisor Meredith Winkler who asked Willmeng if he had any navy blue scrubs that he could change into. Willmeng did not answer and instead pulled out his phone and began to read an e-mail message to Winkler. The nursing supervisor decided not to pursue the conversation at that time and walked away toward the charge nurse desk. Willmeng followed Winkler to the charge nurse desk where he engaged in a loud, heated exchange with Winkler and the charge nurse, Jean Dahm. Both Winkler and Dahm testified that Willmeng pointed a finger at each of their faces and yelled angry comments. They claimed he yelled at Dahm that she was not protecting her staff and at Winkler accusing her of harassment. For his part, Willmeng acknowledged that he may have been loud, but he denied that he yelled at the other two nurses. A subsequent investigation concluded that Willmeng's actions violated United's Respectful Workplace Policy and Code of Conduct.

10

Meanwhile, Willmeng continued to wear hospital-issued scrubs and the Employer resumed its enforcement of the Dress Code policy. The Employer issued the grievant another written warning for being out of uniform on May 4 and then a final written warning on May 5. When Willmeng again started his shift on May 8, 2020 again wearing hospital-issued scrubs, the Employer presented Willmeng with a termination letter. The letter stated that the termination was for his continued violation of the Dress Code and Scrub Clothes policies and for violating the Respectful Workplace Policy and Code of Conduct.

Nurse Willmeng testified with respect to a number of issues at the arbitration hearing. Willment testified that, based upon his review of numerous scientific sources, he sincerely believed that the virus posed a risk to human life that outweighed the expense to the hospital of laundering a pair of scrubs. He testified that United's strict adherence to its Dress Code policy made little sense in light of the fact that Allina Health made hospital-provided scrubs available to emergency room personnel at the larger Abbott Northwestern Hospital complex in Minneapolis, and that he did not observe any evidence of a shortage of hospital-owned scrubs at United. Willmeng also testified that many other employees had posted "selfies" taken in patient care rooms on social media sites without incurring discipline.

With respect to the Union's unfair labor practice claim, Willmeng testified that he was engaged in a conversation with another nurse in the emergency room on March 25, 2020 when ED Patient Care Manager Kelly Johnson approached the area. Johnson apparently believed that the conversation involved Union matters, and she told Willmeng that employees were not permitted to conduct Union business with employees who are working in a patient care area.

11

## POSITIONS OF THE PARTIES

**Employer**

The Employer contends that it had just cause to discharge the grievant for his repeated violations of the Dress Code and Scrub Clothes policies and for violating the Respectful Workplace Policy and Code of Conduct. The Employer maintains that the Dress Code policy is a reasonable work rule and that Willmeng was fully aware of the rule and its purpose. As for the remedy, the Employer argues that discharge is appropriate due to the failure of progressive discipline to correct the grievant's behavior and because the Employer's discharge decision did not constitute disparate treatment. Finally, the Employer asserts that its actions did not violate either the safety provisions of the parties' agreement or constitute an unfair labor practice under the National Labor Relations Act (NLRA).

**Union**

The Union argues that the Employer lacked just cause for its discharge decision. While the Union acknowledges that Willmeng did not comply with United's Dress Code policy, the Union claims that policy, while reasonable on its face, became unreasonable in light of the uncertainties and dangers posed by the COVID-19 pandemic. The Union also argues that discharge is too severe of a sanction in the context of this case. The Union contends that the Employer's discharge decision was tainted by disparate treatment and by the fact that Allina permitted the widespread use of hospital-issued scrubs at its Abbot Northwestern facility. Beyond the termination issue, the Union contends that the Employer violated the parties' contract by failing to maintain a safe work environment and that it violated the NLRA by forbidding the discussion of union-related safety concerns in the workplace.

12

## DISCUSSION AND OPINION

**A.      The Discharge Grievance**

**1.      The Just Cause Standard**

In accordance with the terms of the parties' collective bargaining agreement, the Employer bears the burden of establishing that it had just cause to support its disciplinary decision. This inquiry typically involves two distinct steps. The first step concerns whether the Employer has submitted sufficient proof that the employee actually engaged in the alleged misconduct or other behavior warranting discipline. If that proof is established, the remaining question is whether the level of discipline imposed is appropriate in light of all of the relevant circumstances. *See* ELKOURI & ELKOURI, HOW ARBITRATION WORKS 15-25 (8th ed. 2016). Each of these steps is discussed below.

**2.      The Alleged Misconduct**

The Employer alleges that the grievant engaged in two types of misconduct: 1) repeated violations of United's Dress Code and Scrub Clothes policies; and 2) violation of the Respectful Workplace Policy and Code of Conduct.

**a.      The Dress Code Violations**

The Employer has adopted and published a Dress Code policy that requires employees to wear a scrubs uniform that is color-coded by department. Pursuant to this policy, nurses working in the Emergency Department are required to wear navy-blue scrubs, and they are personally responsible for laundering those scrubs. United also has a Scrubs Clothes policy which authorizes employees who work in semi-restricted or restricted invasive care procedure areas to wear ceil blue scrubs that United both provides and launders. Nurses working in the Emergency Department are not authorized to wear hospital-issued scrubs unless their personal scrubs

13

become contaminated with blood or body fluids. As a general matter, these rules are reasonable on their face in that they enable patients and staff to readily identify employees by function and preserve hospital laundered scrubs for those patient care areas where maintaining a sterile environment is most crucial.

It is undisputed that Willmeng wore hospital-issued ceil blue scrubs rather than regulation navy blue scrubs for each of his work shifts from March 24, 2020 to May 8, 2020. He continued to violate the Dress Code even though the Employer counseled him about Dress Code requirements and reinforced that counseling with four progressive discipline sanctions.

The Union argues that while the Dress Code is reasonable on its face, its enforcement became unreasonable due to the health and safety perils posed by the pandemic. The Union contends that Willmeng had a good faith belief that compliance with the Dress Code could endanger his health and that of his family. Under these circumstances, the Union urges that considerations of safety should temporarily excuse Dress Code compliance.

While the pandemic has undoubtedly upended many workplace expectations and requirements, I do not believe that it should provide a blanket work rule exemption in this context. The avoidance of imminent danger may constitute a defense to insubordination under some circumstances, such as in the absence of any feasible alternatives. *See* DISCIPLINE AND DISCHARGE IN ARBITRATION 200-202 (Brand & Biren, eds., 2nd ed. 2008). But, this is not such a case. Here, the Employer utilized counseling and persuasion in attempting to garner work rule compliance. The Employer first used education rather than discipline in explaining that the use of hospital-issued scrubs was not indicated in the scientific literature for personnel not engaged in invasive procedures. The Employer also communicated that a potential shortage of hospital-issued scrubs made hospital-wide use unfeasible. When these steps were not effective, the

14

Employer utilized progressive discipline to make clear that ongoing non-compliance would not be tolerated. Given these circumstances, I find that the grievant's repeated refusal to follow the Dress Code policies was not an objectively reasonable response.

In short, I think that the Employer has adequately established that the grievant engaged in misconduct by repeatedly violating the Dress Code policies.

### b. The Respectful Workplace Policy and Code of Conduct

The Employer alleges that Mr. Willmeng also violated the Respectful Workplace policy and the Code of Conduct by aggressively pointing a finger at close range and yelling at a nursing supervisor and a charge nurse on April 24, 2020. The Union acknowledges that the incident took place and that Willmeng was speaking in a loud voice, but it contends that Willmeng was not yelling at the two co-workers. I believe that the Employer has met its burden to establish that the grievant did engage in this misconduct.

**The Appropriate Remedy**

The Employer claims that discharge is an appropriate sanction because of the grievant's open and continued violations of the Dress Code policies over a six-week period. The Employer maintains that Willmeng's violation of the Respectful Workplace and Code of Conduct policies constitutes an additional aggravating factor. The Employer argues that when counseling and progressive discipline efforts proved unsuccessful in correcting Willmeng's behavior, the Employer had no choice but to resort to termination.

The Union responds with two arguments. The first – a claim of disparate treatment – can be quickly dismissed. The Union claims that Willmeng was singled out for discharge even though at least five other nurses wore hospital-issued scrubs and were not terminated. The problem with this argument is that none of the other nurses were similarly situated to Willmeng.

15

Four of the nurses stopped wearing the hospital-issued uniforms after being subject to counseling and/or the early steps of progressive discipline. The remaining nurse left employment. None of these nurses continued to openly violate the Dress Code policies despite three counseling sessions and four progressive discipline steps.

The Union's second argument is more persuasive. The Union contends that even if Willmeng's good faith, but mistaken belief is not sufficient to excuse enforcement of the Dress Code policy in its entirety, it should nonetheless be relevant to the issue of remedy. Put another way, since the good cause issue with respect to the appropriate sanction depends upon a consideration of all the relevant circumstances, Willmeng's good faith belief that the potential harm of exposure to COVID-19 necessitated a departure from the Dress Code policy warrants some remedy short of discharge. The pandemic posed a set of dangers unique during the past century. Front-line health care workers are particularly at risk in this environment and a search for possible precautions to minimize the potential for great harm is understandable.

By all accounts Willmeng is a good emergency room nurse. He testified that with increased knowledge and vaccinations, his possible return to work would involve a much different landscape than in the Spring of 2020. I believe that Nurse Willmeng deserves a second chance at employment with United. But, Willmeng's unwillingness to comply with the Dress Code policies despite counseling and progressive discipline means that the Employer should not bear responsibility for the loss of pay triggered by this behavior. In addition, Willmeng should understand that any future violation of valid workplace policies could put a legitimate end to his return to work. Accordingly, I will resolve the disciplinary portion of this case by directing the Employer to reinstate the grievant but without any liability for back pay.

**B.    The Workplace Safety Grievance**

16

Article 22 of the parties' collective bargaining agreement provides as follows:

(a)   <u>Safety Policy:</u> It shall be the policy of the Hospital that the safety of the nurses, the protection of work areas . . . are a continuing and integral part of its everyday responsibility.

(b)   <u>Equipment and Facilities:</u> The Hospital will make reasonable effort to provide nurses with safe and adequate equipment, working environment and facilities.

In its post-hearing brief, the Union summarized its argument on this second issue as follows: "The Employer failed to protect work areas or engage in necessary safety practices, and failed to make reasonable efforts to provide nurses with a safe working environment."

The Union claims that the Employer violated Article 22 by not modifying its Dress Code policies in response to the pandemic to permit Willmeng and other nurses to wear hospital-issued scrubs. The Union points to the fact that the Employer allowed nurses at Abbott Northwestern Hospital to wear hospital-issued scrubs as undercutting United's alleged safety and supply reasons for not adopting a similar safety conscious practice at Allina's United campus. The Union also alleges that United's actions in not consulting with the Union concerning its "pause" in enforcing the Dress Code policy and in addressing the purported shortage of available hospital scrubs are inconsistent with its obligations under Article 22.

I can understand the Union's frustration with the Employer's failure to consult with the Union about the Dress Code issues. Involving the Union in addressing staff concerns would have been therapeutic and perhaps could even have led to a mutually acceptable outcome. I do not think, however, that the Employer's failure to modify its Dress Code policies constitutes a violation of Article 22. United, acting through its Infection Prevention and Control Committee, reviewed the scientific evidence and the recommendations of the leading expert agencies in concluding that expanding the availability of hospital-issued scrubs was not a necessary step to

17

protect its nurses against the pandemic.   Accordingly, I do not find that the Employer actions violated Article 22.

## C.     The Unfair Labor Practice Issue

The Union also has filed an unfair labor practice charge claiming that the Employer violated NLRA section 8(a)(1) by interfering with Mr. Willmeng's rights as a Union steward to engage in Union-related communications with other bargaining unit employees.   The parties have stipulated that this issue is ripe for resolution in this arbitration proceeding.

The unfair labor practice claim arose out of a conversation that took place on March 25, 2020.   On that day, Willmeng and another nurse were having a conversation in the emergency room when Patient Care Manager Kelly Johnson approached the area.   Johnson overheard Willmeng talking about Union matters, and she told Willmeng that employees were not permitted to conduct Union business with employees who are on duty in a patient care area.

The Union contends that Johnson's actions violated the NLRA by discouraging concerted activity at the workplace.   The Union also points out that the employer has no written policy that explicitly proscribes union-related conversations on the work floor.

The National Labor Relations Board has log held that an employer may limit working-time union solicitation activity.   In <u>Peyton Packing Co., Inc.</u>, 49 N.L.R.B. 843, 844 (1943), the Board ruled that an employer can "make and enforce reasonable rules covering the conduct of employees on company time.   Working time is for work.   It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours.   Such a rule must be presumed to be valid."   Here, the conversation in question took place during a time during which both employees were on duty and in a place that was a patient care working area.   In these circumstances, an employer has the right to adopt a policy that limits union-related

18

activity even in the absence of an explicit written prohibition. Accordingly, I conclude that the Employer did not act illegally by telling Mr. Willmeng that a union-related conversation was not permissible in a working area during working time.

## AWARD

The discharge grievance is granted in part and denied in part. The Employer is directed to reinstate the grievant but without any obligation for back pay.

The workplace safety grievance is denied.

The unfair labor practice claim is denied.

Dated: April 20, 2021

Stephen F. Befort
Arbitrator

# STINSON



**Dominic Cecere**
**PARTNER**
DIRECT: 612.335.7005
OFFICE: 612.335.1500

dominic.cecere@stinson.com

May 5, 2021

Stephen F. Befort
**Via E-mail** (befor001@umn.edu)

Re:     *In the Matter of the Arbitration Between Minnesota Nurses Association and Allina Health*
*(United Hospital)*—FMCS No. 200821-09339

**Allina Health's (United Hospital) Partial Motion for Reconsideration or, in the Alternative, Motion to Stay Reinstatement Pending Its Motion to Vacate Award**

Dear Arbitrator Befort:

Allina Health's United Hospital ("United") received your award issued on April 20, 2021, in the above-referenced arbitration (the "Award"). Thank you for your time and consideration of this matter. Upon review of the Award, United notes certain internal inconsistencies that it would like to address. Moreover, it is United's view that the ultimate order for reinstatement exceeds the arbitral authority granted in this matter. Consequently, United respectfully submits this Partial Motion for Reconsideration of the Award ordering reinstatement of Clifton Willmeng ("Willmeng") or, in the alternative, Motion to Stay Reinstatement Pending Its Motion to Vacate Award.

## <u>ARGUMENT IN SUPPORT OF RECONSIDERATION</u>

### I.  **Rejecting Willmeng's "Good-Faith Belief" as an Excuse for Noncompliance with United's Dress Code Policy, but Mitigating Discharge Based on Willmeng's "Good-Faith Belief" Gives Rise to Internal Inconsistency Within the Award.**

First and foremost, United does not ask you to reevaluate Willmeng's credibility. For purposes of its Motion for Reconsideration, United accepts your conclusion that while employed with United, Willmeng maintained a good-faith belief that the coronavirus remained viable on

50 South Sixth Street, Suite 2600, Minneapolis, MN 55402

**STINSON LLP**  \  **STINSON.COM**

May 5, 2021
Page 2

scrubs for prolonged periods of time, posing a risk to himself and others. (*See* Award at 8-9). However, United requests that you take your finding—that Willmeng's good-faith belief that compliance with United's Dress Code Policy presented health and safety concerns did not "constitute a defense to insubordination"—to its consistent conclusion. (Award at 14).

In the Award, you found United's Dress Code Policy "reasonable on its face" and recognized that Willmeng had prior knowledge of the policy and its consequences. (Award at 13-14). You further concluded that Willmeng's good-faith belief that the policy as applied presented health and safety risks was not a defense for noncompliance. (Award at 14). Accordingly, United understands your Award to condone United moving forward with its normal course of action for insubordination—i.e. progressive discipline.

It is undisputed that United utilized progressive discipline with Willmeng and, in fact, exercised additional leniency by initiating two educational meetings and a counseling session prior to its four progressive discipline steps preceding discharge. (Award at 14, 16). Considering your conclusion that Willmeng was not excused from compliance, Willmeng's ultimate termination was consistent with the Award's findings on the merits.

In otherwise holding, the Award necessarily forces United into an irreconcilable position: Willmeng's good-faith belief that United's Dress Code Policy presented health and safety concerns did not excuse his noncompliance. Accordingly, United was justified in using progressive discipline "to make clear that ongoing non-compliance would not be tolerated." (Award at 15). Nevertheless, Willmeng could continue his ongoing noncompliance with the policy because his good-faith belief immunized him from termination.

Moreover, the Award acknowledged that the Dress Code Policy "preserve[s] hospital-laundered scrubs for those patient care areas where maintaining a sterile environment is most crucial" and credited United's determination that "a potential shortage of hospital-issued scrubs made hospital-wide use unfeasible." (Award at 14). Your subsequent determination that

May 5, 2021
Page 3

Willmeng's discharge should be mitigated because during the coronavirus pandemic, "a search for possible precautions to minimize the potential for great harm is understandable," runs contrary to these aforementioned findings. (Award at 16). Willmeng did not take advantage of a *possible* precaution by using hospital-provided scrubs. Rather, as you acknowledged, Willmeng took from a limited supply of scrubs reserved for sterile environments where it was *not possible* for United to risk running out of supply. Thus, Willmeng does not fall into the exception the Award carves out for him.

## II. Mitigating Discharge to Offer Willmeng a "Second Chance at Employment" Negates the Award's Prior Finding that Willmeng Had Seven Chances at Employment.

In the Award, you credited United's use of progressive discipline with Willmeng in enforcing its reasonable Dress Code Policy. (Award at 9-11, 14, 16). You found that United "utilized counseling and persuasion in attempting to garner work compliance" by providing Willmeng with two educational non-disciplinary meetings and one non-disciplinary counseling session prior to initiating any discipline. (Award at 14). You highlighted United's use of progressive discipline—a verbal warning, written warning, repeated written warning and final written warning—before discharge. (Award at 9-11). Despite naming all seven chances offered to Willmeng at continued employment, you direct United to provide Willmeng with a *second* chance, without clarifying the intended distinction between the second through seventh chance Willmeng already received in Spring of 2020 and the second chance outlined in the Award. (Award at 16).

## III. The Award Reaches Beyond Arbitral Authority to Inhibit United's Progressive Discipline Process and Permit Employees to Ignore Reasonable Work Rules.

Under the parties' collective bargaining agreement ("CBA"), an arbitrator is granted jurisdiction to determine if an employee's termination was for "just cause." (*See* Award at 13). The CBA does not, however, permit an arbitrator to call out an employee state of mind (i.e. "good-faith belief") that protects the employee entirely from the final step in progressive discipline—

termination—no matter how openly and repeatedly the employee violates an otherwise reasonable work rule.

An order to reinstate Willmeng runs afoul of the arbitral authority granted in this matter. The Award leaves United with a progressive discipline process that caves in on itself in cases where an employee, like Willmeng, maintains a "good-faith belief" that their conduct is justified by a concern for health and safety. In such a case, United can only "progress" to an endless loop of discipline short of discharge despite the employee openly and repeatedly violating its reasonable rules and policies. Such an award communicates to United employees that a work rule may be reasonable, their noncompliance may not be justified and, yet, they can continue to refuse to follow United's longstanding rules and policies. Protecting an employee from termination carte blanche so long as their conduct is premised on a good-faith belief that compliance risks their health and safety makes efficiently operating a healthcare system like United incredibly difficult and poses genuine, objective health and safety risks to United's patients and staff.

## MOTION TO STAY REINSTATEMENT PENDING MOTION TO VACATE AWARD

In the event you decline to reconsider the Award ordering United to reinstate Willmeng, United intends to submit a Motion to Vacate the Award in the United States District Court for the District of Minnesota. Pending its Motion to Vacate the Award, United requests that you stay Willmeng's reinstatement pending the District Court's determination on United's Motion to Vacate consistent with your arbitral authority. *See, e.g., Coffee Beanery Ltd v. WW L.L.C.*, 2006 WL 2033929, at *4 (E.D. Mich. July 18, 2006) ("[T]he broad powers of the arbitrator to resolve the parties' dispute includes the power to stay or delay the arbitration proceedings.").

## CONCLUSION

United respectfully submits that it had just cause to discharge Willmeng and requests that you reconsider the order for reinstatement in rendering an award consistent with the Award's

May 5, 2021
Page 5

findings on the merits.  In the alternative, United respectfully requests that you grant United's

Motion to Stay Reinstatement Pending Its Motion to Vacate Award.

Sincerely,

**Stinson LLP**

*/s/ Dominic J. Cecere*

Dominic J. Cecere


DJC:

cc: chris@wachtlerlaw.com



EXHIBIT

_E_

# ARBITRATION

## Before: Arbitrator Stephen Befort

IN THE MATTER OF:                FMCS Case No.:   200821 – 09339

Minnesota Nurses Association,

- and-

Allina Health (United Hospital)
Cliff Willmeng Termination Grievance

---

## MNA RESPONSE TO ALLINA'S REQUEST FOR RECONSIDERATION

---

Following a three-day arbitration hearing on January 28, 29 and
February 1, 2021, the Arbitrator issued an Award on April 20, 2021, denying
certain aspects of the Union's grievances, but reinstating the Grievant to his
position as a Registered Nurse at United Hospital, which is owned and
operated by the Employer, Allina Health. The Employer, by Partial Motion for
Reconsideration of the Award, now requests that the Arbitrator reconsider
this Award insofar as it orders reinstatement. The Employer also moves the
Arbitrator to stay the Grievant's reinstatement pending its possible Federal
District Court Motion to Vacate or Modify.

### LEGAL STANDARD

As the Employer has stated an intent to seek, in Court, vacation of the
portion of the Award relating to reinstatement, a review of the applicable legal
framework seems useful.

The **Federal Arbitration Act (FAA), 9 U.S.C. §10**, governs vacation of arbitration awards and allows same only where an award was procured by "corruption, fraud, or undue means", where there was "evident partiality or corruption", where an arbitrator was "guilty of misconduct in refusing to postpone the hearing. . . or in refusing to hear evidence pertinent and material to the controversy" or "any other misbehavior by which the rights of any party have been prejudiced." Only where an arbitrator has "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made" is vacation warranted.

**Section 11 of the FAA** allows modification or correction of an award under similarly limited circumstances: where there was an "evident material miscalculation of figures or an evident material mistake"; where there is an award issued "upon a matter not submitted"; or where the award is "imperfect in matter of form not affecting the merits of the controversy."

The **Revised Uniform Arbitration Act (RUAA), Section 23, adopted and codified by Minnesota Statute § 572B.23** in the State of Minnesota, states:

(a) Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:

 (1) the award was procured by corruption, fraud, or other undue means;

 (2) there was:

  (A) evident partiality by an arbitrator appointed as a neutral arbitrator;

  (B) corruption by an arbitrator; or

  (C) misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

 (3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted

the hearing contrary to Section 15, so as to prejudice substantially the rights of a party to the arbitration proceeding;

(4)    an arbitrator exceeded the arbitrator's powers;

(5)    there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection under Section 15(c) not later than the beginning of the arbitration hearing; or

(6)    the arbitration was conducted without proper notice of the initiation of an arbitration as required in Section 9 so as to prejudice substantially the rights of a party to the arbitration proceeding.

**Section 24 of the RUAA and Minn, Stat. § 572B.24** contain almost identical requirements for modification of arbitration awards as those articulated in the FAA, Section 11.

It is a well-established principle that "the merits of an arbitrator's decision are virtually unreviewable in an action to vacate his award." *Midwest Div.-LSH, LLC v. Nurses United for Improved Patient Care*, 720 F.3d 648, 650 (8th Cir. 2013). "Judicial review of the labor arbitration award is narrow and deferential. An arbitrator's award must be upheld if it draws its essence from the collective bargaining agreement. . ." *Breckenridge O'Fallon, Inc. v. Teamsters Union Local No. 682*, 644 F.3d 1230, 1233-34 (8th Cir. 2012) (quotation omitted).

A Court's role in reviewing arbitration awards is constrained when it is asked to determine whether the Arbitrator acted within the scope of his authority-- "(a)s long as the arbitrator is even arguably. . .acting within the scope of his authority, that a court is convinced that he committed serious error does not suffice to overturn his decision." *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *see also International Brotherhood of Electric Workers, Local Union No. 545 v. Hope Electric Company*,

380 F.3d 1084, 1100 (8th Cir. 2004) (holding "in determining whether an arbitrator has exceeded his authority, the agreement must be broadly construed with all doubts resolved in favor of the arbitrator's award" (quotation omitted)).

Courts cannot vacate arbitration awards even when convinced that the Arbitrator committed "serious error," *Major League Baseball Players Association v. Garvey*, 532 U.S. 504, 509 (2001), whether it be "legal error" or "errors of fact or of misinterpretation of the contract." *Misco*, 484 U.S at 36, 38. An arbitral award is afforded "an extraordinary level of deference," and courts "must confirm the award. . .so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Boise Cascade Corp. v. PACE Local 7-0159*, 309 F.3d 1075, 1080 (8th Cir. 2002) (quotation omitted). "While this standard may seem harsh to parties who lose in arbitration, this standard is justified because it is exactly what the parties mutually agreed upon by electing arbitration over judicial resolution of their conflicts." *Electrolux Home Products v. United Auto. Aerospace & Agric. Implement Workers of America*, 416 F.3d 848, 853 (8th Cir. 2005); see also *Coca-Cola Bottling Company of St. Louis v. Teamsters Local Union No. 688*, 959 F.2d 1438, 1440 (8th Cir. 1992) ("Federal labor law is noteworthy for its strong public policy in favor of the private resolution of labor disputes without resort to the courts.").

## ARGUMENT

Nothing in the Employer's request for reconsideration speaks to any relevant legal standard—which is logical, as the Employer cannot meet that standard. As, clearly, no legal basis exists for vacation or modification, it does

not seem appropriate for the Arbitrator to reconsider the Award, with an eye toward vacating or modifying same.

With respect to the Grievant's termination, the issue submitted to the Arbitrator was whether or not the Grievant was terminated for just cause, and if not, what is the appropriate remedy?

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to fashioning remedies." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960); *Midwest Div.—LSH, LLC*, 720 F.3d at 651 ("[W]hen the parties stipulated that the issue submitted to an arbitrator included 'what shall the remedy be,' the [moving party] can hardly argue that the arbitrator 'acted outside his authority' in fashioning a remedy, unless that remedy was expressly prohibited by the CBA.").

Nothing in the Collective Bargaining Agreement (CBA, Joint Exhibit 1) limits the Arbitrator's authority to fashion the remedy afforded in this case. Whether or not the Employer had just cause to terminate the Grievant depended upon "a consideration of all the relevant circumstances" including a pandemic that "posed a set of dangers *unique during the past century*." (Award at page 16, emphasis added). As the Arbitrator noted, "Frontline healthcare workers are particularly at risk in this environment and a search for possible precautions to minimize the potential for great harm is understandable." (Id).

Despite the Employer's assertions to the contrary, the Award and the remedy fashioned are completely consistent with respect to the issue of progressive discipline. A suspension - the ultimate remedy found to be appropriate--was an option available to the Employer (as contemplated by

Article 17 of the CBA, on page 87 of Joint Exhibit 1), in light of the Grievant's ongoing good-faith belief that not using surgical scrubs posed a threat to his health and safety, in violation of Article 22 of the CBA (as asserted by the Union at arbitration). The Employer easily could have imposed an indeterminate suspension, or placed the Grievant on leave, with instructions to return to work when he was prepared to comply with the dress code. The Award makes it crystal clear that a suspension would have been appropriate and that that was an option available to be Employer.

The Employer's argument with respect to progressive discipline is undermined by other language in the Award, which essentially finds that the Employer did not allow the process play out: any additional violations of the dress code policy will justify termination. Any concerns regarding progressive discipline and "insubordination" are rendered invalid by the fact that the Employer has an adequate mechanism to address them if and when the Grievant were to return and violate the dress code policy.

Further, no legal basis exists for a stay of the Grievant's reinstatement pending appeal. The CBA contains no mechanism for doing so. It is not something for which the parties bargained as part of the grievance procedure articulated in the contract.

The case Employer sites, *Coffee Beanery Limited v. WW LLC,* 2006 WL 2033929 (Eastern District of Michigan July 18, 2006), is factually dissimilar and wholly inapplicable. In that case, one of the parties to a franchise agreement (which contained an arbitration clause) sought to stay arbitration altogether, pending the outcome of an administrative/regulatory investigation against it. The Federal District Court actually *denied* the motion to stay the arbitration proceedings, and the "broad powers" of the arbitrator (to which

6

the Employer here refers in its request for reconsideration) had nothing to do with implementing any sort of remedy, but instead related to the case proceeding to arbitration in the first place, at that particular point in time.

The Employer's request for a stay is analogous to a request for temporary relief under the Federal Rules of Civil Procedure, Rule 65, or the Minnesota Rule of Civil Procedure 65.01, which govern Temporary Injunctions and Restraining Orders that may be granted only if it clearly appears from the specific facts shown that "immediate and irreparable injury, loss or damage will result" to the movant or applicant.

In Minnesota, whether a party is entitled to temporary injunctive relief requires consideration of five factors:

> (1) the nature and background of the previous relationship between the parties;  (2) the harm to be suffered by one party if the injunction is issued as compared to the harm to be suffered by the other party if it is denied;  (3) the likelihood that the party seeking the injunction will prevail on the merits;  (4) public policy considerations;  and (5) any administrative burden involved in enforcement of the injunction.

*Shakopee Mdewakanton Sioux (Dakota) Community v. Minnesota Campaign Finance & Public Disclosure Bd.*, 586 N.W.2d 406, 409 (Minn.App. 1998) citing *Dahlberg Bros., Inc. v. Ford Motor Co.*, 272 Minn. 264, 274-75, 137 N.W.2d 314, 321-22 (1965)).

These factors, to the extent that they may be usefully applied here, weigh heavily in favor of the Union, and the Grievant. The Grievant has been out of work--without good cause, by the terms of the Award-- for over a year. He testified that he has had no success, despite his best efforts, in obtaining employment while this matter has been pending. His family is dependent on him for income, he is entitled to return to work, and should be allowed to do so

immediately. The Employer has not articulated any way in which it would be harmed by his return, or burdened administratively-- nor has it articulated any public policy which would be compromised.

The Union and the Employer have a relationship based on orderly labor relations, which include the bargained-for resolution of disputes through efficient, binding and final arbitration.

Finally, as evidenced by the overwhelming weight of the applicable jurisprudence, the Employer has very little likelihood of success on the merits should it chose to appeal.

## CONCLUSION

For these reasons, the Minnesota Nurses Association requests that the Arbitrator deny the Employer's Motions in their entirety.

WACHTLER LAW OFFICE

5-13-21
Date

CHRISTOPHER K. WACHTLER
#0261373
983 Ashland Ave.
St. Paul, MN 55104
chris@wachtlerlaw.com
651-983-3769

8



**EXHIBIT**

**F**

### IN THE MATTER OF ARBITRATION BETWEEN

|  |  |
|---|---|
| ) | |
| **MINNESOTA NURSES ASSOCIATION,**) | |
| ) | |
| **Union,** ) | **WILLMENG DISCHARGE** |
| ) | |
| **and** ) | **ORDER IN RESPONSE TO** |
| ) | |
| ) | **MOTION FOR RECONSIDERATION** |
| **ALLINA HEALTH** ) | |
| **(UNITED HOSPITAL),** ) | |
| ) | |
| **Employer.** ) | **FMCS CASE NO: 200821-09339** |
| ) | |

On May 5, 2021, Allina Health submitted a Partial Motion for Reconsideration or, in the alternative, a Motion to Stay Reinstatement Pending Its Motion to Vacate Award. The Minnesota Nurses Association submitted a Response on May 12, 2021 opposing those motions. Based upon a consideration of these submissions as well as the record of this proceeding as a whole, I now make the following Order:

The motions submitted by Allina Health are denied.

May 18, 2021

Stephen F. Befort
Arbitrator