UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Minnesota Nurses Association,

    Plaintiff,

v.

Allina Health,

    Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 21-1364 (MJD/KMM)

---

    Christopher K. Wachtler, Wachtler Law Office, Counsel for Plaintiff.

    Dominic J. Cecere and Joel E. Abrahamson, Stinson LLP, Counsel for Defendant.

---

    Plaintiff Minnesota Nurses Association ("Union") filed this action in order to remedy Defendant Allina Health's ("Allina") failure to comply with the Arbitration Award dated April 20, 2021 that directed Allina to reinstate the grievant, Cliff Willmeng ("Willmeng"), but without any backpay. The Union seeks to confirm the Arbitration Award, and seeks immediate reinstatement of Willmeng's job with backpay, seniority, and benefits retroactive to the date of the Arbitration Award.

Currently before the Court is the Union's motion for a temporary restraining order and/or preliminary injunction directing Allina to comply with the Arbitration Award. In response to this motion, Allina has filed a cross motion to vacate the Arbitration Award.[1]

I. Background

The Union is a labor organization that represents over 20,000 registered nurses throughout the Upper Midwest. Willmeng was employed in the Emergency Department at United Hospital ("United"), which is owned by Allina, from October 2019 through May 8, 2020. (Willmeng Aff. ¶ 2; Comp. Ex. B (Arbitration Award at 7).)

United adopted a Dress Code Policy in 2012 that provides for a color-coded system by which employees are required to wear the color designated for their respective departments. (Comp. Ex. B (Arbitration Award at 7).) Registered nurses with direct patient care such as Willmeng are to wear their own personal navy blue-colored scrubs for which they are responsible for laundering. (Id.) The Dress Code provides that if the employee works in a restricted invasive care procedure area or if the employee's scrubs are

---

[1] The parties agreed they would not address the merits of the motion to vacate at this time. (See Doc. No. 22 (Reply at 1, n.1).)

contaminated with blood or bodily fluids, the employee may substitute hospital-provided and laundered ceil blue scrubs . (Id.)  The Emergency Department is not considered a restricted or semi-restricted invasive care procedure area.  (Id.)

When the COVID-19 pandemic reached Minnesota in March 2020, hospitals were considered essential and the emergency room at United continued to provide patient care.  (Id.)  United's response to the pandemic was led by its Infection Prevention and Control Committee, which reviewed scientific research and recommendations and developed a system-wide response plan.  (Id. at 8.)  The plan was continuously monitored and updated and employees could access the plan on a dedicated internet site, and e-mail communications were frequently sent to employees highlighting key developments and recommendations.  (Id.)

At the Arbitration hearing, many employees testified that the volume of COVID-19 related communications were overwhelming and that many nurses were confused and fearful of their safety.  (Id.)  A key concern was the personal scrubs, which some believed could be contaminated at work and would pose a risk of infection to employee family members when the scrubs were brought home for laundering.  (Id.)  The Union brought these concerns to Allina's

attention by letter in late March 2020, and filed a grievance related to health and safety concerns on April 9, 2020. (Id.)

Willmeng believed that Allina was not doing enough to maintain a safe workplace, and as a Union steward, he reviewed numerous scientific articles to enhance his ability to advocate appropriate safeguards. (Id.) Willmeng testified that his research led him to believe the virus could remain infectious on clothing for a long period of time, and that Allina's Dress Code could potentially expose his family to the virus. (Id. at 8-9.)

On March 24, 2020, Willmeng donned hospital-provided scrubs to wear during his shift rather than his personal scrubs. (Id. at 9.) He continued this practice for two weeks, prompting Allina to hold two educational meetings and one counseling session with Willmeng. (Id.) During these meetings, the Dress Code was discussed and Willmeng was informed that Allina's policy was consistent with the recommendations of the leading health agencies, including the CDC and the World Health Organization. (Id.)

On April 15, 2020, Allina issued Willmeng a verbal warning as he continued to wear the hospital-provided scrubs and for violating United's Use of

Personal Electronic Equipment policy when he took "selfies" in patient care rooms and posting them to social media. (Id.) The next day, United issued Willmeng a written warning when he again wore the hospital-provided scrubs during his shift. (Id.)

During this time, at least five other registered nurses who worked in United's Emergency Department also wore hospital-provided scrubs and were subject to non-disciplinary counseling. (Id.)

United paused its enforcement of the Dress Code in order to take another look into the concerns of the nurses. (Id.) United's Infection Prevention and Control Committee reviewed the scientific literature and the recommendations of leading health agencies to determine whether there was a need to change the Dress Code. (Id. at 10.) This Committee concluded that the scientific research did not support a change in the Dress Code. United also looked into whether the hospital-wide provision of hospital-laundered scrubs was feasible as a matter of logistics, and determined that United would run the risk of running out of hospital-provided scrubs for employees working in the restricted invasive procedures areas if it expanded the provision of these scrubs to staff working outside of the restricted areas. (Id.)

On April 24, 2020, Willmeng donned the hospital-provided scrubs during his shift and was approached by the Nursing Supervisor who asked him to change into his personal navy blue scrubs. (Id.) Willmeng instead pulled out his phone and began reading an e-mail to the supervisor. (Id.) The supervisor did not pursue the conversation and walked to the charge nurse desk. (Id.) Willmeng followed her and began a loud, heated exchange with the supervisor and a charge nurse. The supervisor and charge nurse claimed that Willmeng pointed a finger at each of their faces and yelled angry comments, accusing them of not protecting staff and that the supervisor was harassing him. (Id.) Willmeng concedes he may have been loud, but denied yelling at them. (Id.) This incident was investigated and it was decided that Willmeng had violated United's Respectful Workplace Policy and Code of Conduct. (Id.)

Willmeng continued to wear hospital-provided scrubs and United resumed its enforcement of the Dress Code policy. (Id. at 11.) United issued Willmeng a written warning, followed by a final warning on May 5, 2020. (Id.) When Willmeng started his shift on May 8, 2020 wearing hospital-provided scrubs, he was given a termination letter. (Id.) The termination letter stated he

was being terminated for his continued violation of the Dress Code and for violating the Respectful Workplace Policy and Code of Conduct. (Id.)

The Union brought a grievance claiming Allina violated the parties' CBA by discharging Willmeng without just cause. The grievance proceeded to arbitration, where the following issues were presented: whether the employer had just cause to discharge Willmeng, and if not, what is the proper remedy; whether the employer's actions relating to Willmeng violated Articles 17, 20 or 22 of the CBA, and whether Kelly Johnson, by informing Willmeng on March 25, 2020 that he was not allowed to conduct Union business in a patient care area, violated the NLRA. (Id. at 2.)

In a decision dated April 20, 2021, the Arbitrator granted the Union's discharge grievance in part and denied in part. The Arbitrator directed Allina to reinstate Willmeng, but without any obligation for back pay. The Arbitrator denied the Union's workforce safety grievance and the unfair labor practice grievance. (Id. at 19.)

On May 5, 2021, Allina submitted a partial motion for reconsideration of the Arbitration Award to the Arbitrator, and a motion to stay reinstatement

pending a motion to vacate the Arbitration Award. (Comp. Ex. D.) The Arbitrator denied Allina's motion by Order dated May 18, 2021. (Comp. Ex. F.)

## II. Temporary Restraining Order/Preliminary Injunction

The Union has moved for a temporary restraining order and/or an order for preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure. The legal standards for a temporary restraining order and a preliminary injunction are the same. See S.B. McLaughlin & Co., Ltd. V. Tudor Oaks Condominium Project, 877 F.2d 707, 708 (8th Cir. 1989).

When determining whether preliminary injunctive relief is warranted, a district court considers the following four factors: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between this harm and the injury that an injunction would inflict on other parties, and (4) the public interest. Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). The Union bears the burden of establishing that each factor favors granting such relief. 3M Company v. Nationwide Source Inc., 2021 WL 141539 (D. Minn. Jan. 15, 2021) (citing Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 705 (8th Cir. 2011)).

> In balancing the equities no single factor is determinative. The likelihood that the plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

Dataphase, 640 F.2d at 113.

### A. Irreparable Harm

> The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction. It is well established that "[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."

Grasso Enterprises, LLC. v. Express Scripts, Inc., 809 F.3d 1033, 1039-40 (8th Cir. 2016) (internal citations omitted).

The Union argues that it is bringing this motion as Willmeng's personal representative, and that it is the Union's charge to defend the CBA and to challenge terminations which lack just cause. The Union argues that Allina's refusal to comply with the Arbitration Award strikes at the core of its ability to represent its members. Further, Willmeng has suffered harm as he has not been

9

able to obtain employment since he was terminated in May 2020. In support, Willmeng has submitted an affidavit in which he asserts he has not been able to obtain new employment, despite regularly submitting applications. (Willmeng Aff. ¶ 4.) He further states that while employed by Allina, he was the primary source of health insurance for the family, which includes his wife and two children. (Id. ¶ 5.) The family is currently insured under his wife's health care plan that has a high deductible and provides far weaker coverage. (Id.) As a result, he has had to delay non-emergent procedures and has been forced to forego mental health counseling. (Id.) His children have not been able to obtain orthodonture. (Id.) Willmeng further asserts his daughter had to go to urgent care once and the emergency room twice for an undisclosed health issue, and will likely be billed thousands of dollars. (Id. ¶ 7.) His son also suffers from a benign but serious heart malformation and while he concedes the necessary tests "would be partially or completely covered by insurance" he is concerned that the exams will have to be postponed because he will be unable to pay for them because of his employment status. (Id. ¶ 8.) Willmeng further asserts his retirement benefits are not accruing which will delay his eventual retirement. (Id. ¶ 9.)

Financial hardship is not enough to establish irreparable harm. Local Union No. 884, United Rubber, Cork, Linoleum & Plastic Workers of Am. v. Bridgestone/Firestone, Inc., 61 F.3d 1347, 1355 (8th Cir. 1995); see also Packard Elevator v. ICC, 782 F.2d 112, 115 (8th Cir. 1986) ("It is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm.") Further, a claim that an employee incurred medical bills as a result of substandard health insurance coverage is not irreparable harm, as such harm is compensable through the provision of money damages. Central Missouri Paving Co., Inc. v. United Mine Workers of America, Dist. 14, 749 F. Supp. 973, 978 (E.D. Mo. 1990).

In this case, the harm allegedly suffered by Willmeng is compensable by money damages. Further, the Union has provided no support for its claim that Allina's refusal to comply with the Arbitration Award strikes at the core of its ability to represent its members.

Accordingly, the Court finds that the Union has failed to demonstrate it will suffer irreparable harm if the requested injunctive relief is not granted. Because "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction", the Court need not address the remaining factors. Grasso Enterprises, LLC., 809 F.3d at 1039-40.

IT IS HEREBY ORDERED that Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction [Doc. No. 7] is DENIED.

Date: July 16, 2021

s/Michael J. Davis
Michael J. Davis
United States District Court
